Thomas P. Riley, SBN 194706
LAW OFFICES OF THOMAS P. RILEY, P.C.
First Library Square
1114 Fremont Avenue
South Pasadena, CA 91030-3227

Tel: 626-799-9797
Fax: 626-799-9795
TPRLAW@att.net

Attorneys for Plaintiff
J & J Sports Productions, Inc.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J & J Sports Productions, Inc., | Case No. CV 08-0998 JF |
| Plaintiff, | PLAINTIFF'S AFFIDAVIT IN SUPPORT OF PLAINTIFF'S APPLICATION FOR DEFAULT JUDGMENT BY THE COURT |
| vs. | |
| Salvador Medinarios, et al. | |
| Defendant. | |

**PLAINTIFF'S AFFIDAVIT IN SUPPORT OF PLAINTIFF'S APPLICATION FOR DEFAULT JUDGMENT BY THE COURT**

STATE OF CALIFORNIA         )
                            ) ss:
COUNTY OF SANTA CLARA       )

I, JOSEPH M. GAGLIARDI, being duly sworn, deposes and states the following:

1. I am the President of Plaintiff, J & J SPORTS PRODUCTIONS, INC., and as such I am fully familiar with the facts, circumstances, and proceedings heretofore had herein.

2. I make this affidavit in support of Plaintiff's request to recover statutory damages, including attorneys' fees, investigative costs, and interest in the within request for judgment by default.

3. Our company J & J Sports Productions, Inc., is a closed-circuit distributor of sports and entertainment programming. Our company purchased and retains the commercial exhibition licensing rights to the *Fernando Vargas v. Shane Mosley Championship Fight Program* (hereinafter "Program") which was broadcast on February 25, 2006. Our company thereafter marketed the sub-licensing (commercial exhibition) rights in the Program to our company's commercial customers (i.e., casinos, racetracks, bars, restaurants, and nightclubs).

4. Simultaneously with the advent of pay-per-view programming, we began to experience a serious erosion in the sales of our own proprietary programming to our commercial customers throughout the United States of America. To protect ourselves, we endeavored to find out what was the basis for the erosion and determined from our customers that the cause of the erosion of our customer base was the rampant piracy of our broadcasts by unauthorized and unlicensed establishments (signal pirates).

5. In response, we embarked upon a nationwide program to police our signals for the purpose of identifying and prosecuting commercial establishments which pirate our programming (including the *Fernando Vargas v. Shane Mosley Championship Fight Program*, the subject program involved in this lawsuit).

6. Specifically, J & J Sports Productions, Inc., retained, at considerable expense, auditors and law enforcement personnel to detect and identify signal pirates.

To ensure that only illegal locations were visited by the auditors, our company compiled our confidential list of customers (authorized and legal locations) who paid the required license fee to broadcast the Program, and this list was distributed to participating auditing and law enforcement agencies in strict confidence.

7. The above referenced *Program* contained several televised under-card bouts, color commentary, along with the main event prizefight between Fernando Vargas and Shane Mosley. As set forth within the sworn Affidavit of Noe Longoria, it was the beginning of third round of the undercard bout between Jhonny Gonzalez and Mark Johnson that was observed by Mr. Longoria as being *unlawfully* exhibited by the establishment doing business as "The Derby" on Saturday, February 25, 2006, as at no time did this establishment ever lawfully license the *Program* from our company for such a purpose.

8. It is essential that I communicate to the Court that to the best of my knowledge our programming is *not* and cannot be mistakenly, innocently or accidentally intercepted. Some methods that a signal pirate can unlawfully intercept and broadcast our programming are as follows without limitation:

    A. The use of a "blackbox", "hotbox", or "pancake box" which is purchased for a fee and when installed on a cable TV line will allow for the descrambled reception of a pay-per-view broadcast, or

    B. The use of a "smartcard" or "test card" or "programming card" which is purchased for a fee and when installed on a DSS satellite receiver line will allow for the descrambled reception of a pay-per-view broadcast, or

      C.      The purposeful misrepresentation of a commercial establishment as a residential property to allow the fraudulent purchase of a pay-per-view (or prohibited) programming at the residential rate, or

      D.      The use of illegal cable drop or splice from an apartment or home adjacent to the commercial establishment premises (which would purchase the broadcast at a residential price and divert the program to the commercial establishment), and/or

      E.      The purchase of other illegal unencryption devices, and the purchase of illegal satellite authorization codes which are readily available on the internet, in trade publications, and through "word of mouth".

9. Turning these facts to the matter before the Court I have been advised by counsel that the Court has wide discretion in the awarding of statutory damages for the nefarious, illegal and debilitating activities of signal pirates which are injurious to our company and our lawful customers.

10. It is respectfully submitted to this Honorable Court that the unchecked activity of signal piracy not only has resulted in our company's loss of several millions of dollars of revenue, but also has a detrimental effect upon lawful residential and commercial customers of cable and satellite broadcasting whose costs of service are increased significantly by these illegal activities, including the depravation of tax revenue to the communities where our potential customers reside, and the denial of benefits such tax revenue would provide the residents of such communities.

11. We, at J & J Sports Productions, Inc., believe that the persistent signal piracy of our programming costs our company, our customers, and their communities, millions of dollars annually resulting in part, from the perceived lack of consequences (including nominal or minimal damage awards by the Courts who hear our cases) for such unlawful interception and exhibition by the commercial signal pirates.

12. For these reasons I ask this Honorable Court to grant the **maximum** allowance for statutory damages due to the fact that such actions are *per se* intentional and do not and cannot occur without the willful and intentional modification of electronic equipment, the willful and fraudulent misrepresentation of a commercial establishment as a residential one, the removal of cable traps or devices designed to prevent such unauthorized exhibits, or other willful and/or international acts purposely designed to obtain our programming unlawfully.

13. I am also troubled by the fact that the Courts have placed undue weight upon whether the *promotion* of programming by the signal pirates (rather than the *exhibition* of the programming itself) was done willfully and/or for commercial benefit. I would ask the Court to recognize that the willful and purposeful acts necessary to intercept and exhibit the programming precede whatever steps are, or are not taken, by the pirate establishment to promote our programming to their customers.

14. I would also ask the Court to recognize that the pirates do not generally advertise the fact that they intend to exhibit our programming unlawfully to the public for the practical reason that they wish to avoid the unessential risk of detection. This of course does not preclude the very real possibility fact that the unlawful exhibition may well have been promoted by word of mouth or advertising that went undetected by the auditors, to their own customers to increase their financial gain on the night our fights are broadcast at their establishment.

15. In addition, it is extremely unlikely that a pirate establishment would increase the costs of food or drink on the evening they broadcasting one of our programs unlawfully. In my personal experience gained through many years in the promotion industry, it is most uncommon that even our legal locations would employ such a method to recover some of our commercial license fee back from their own

1  customers. I would point out however that since our auditors do not benchmark the
2  prices charged for food or drink at the pirate locations subsequent to conducting the
3  field surveillance on the evening our programming is broadcast, it is undetermined
4  whether the prices paid by an auditor at a pirate location on fight night are in fact less
5  than or equal to the normal prices charged by the pirate establishments.
6
7        16.    I also believe it particularly important that the Court understand that the
8  overwhelming majority of pirate establishments do not, and likely will not, ever charge
9  a cover or door charge to their customers on the evening our programming is
10 exhibited. To do so would defeat the very purpose of pirating on programming in the
11 first place: to lure or retain patrons who seek to be entertained by our programming. If
12 the pirate demanded a cover charge of its patrons then the competitive advantage he or
13 she held over our lawful customers (who regularly impose a cover charge), would
14 dissipate and the pirate's patrons would be faced with a choice of viewing our
15 programming at the pirate establishment or at our lawful customer's locations where
16 the broadcast environment may be much more attractive (i.e., more monitors, bigger
17 monitors, no risk of interference or interception, etc.).
18
19       17.    Clearly, this establishment with multiple television monitors, and a
20 physical location in a major metropolitan area, had no justification to steal our
21 programming and exhibit it for its own financial benefit, except to deny our company
22 the commercial license fee to which was rightfully entitled.
23 ///
24 ///
25 ///
26 ///
27 ///
28 ///
   ///
   ///

```
 1      WHEREFORE I respectfully request that this Court grant our request for
 2  enhanced statutory damages and our prayer for actual damages, plus our legal costs
 3  along with the attorneys' fees counsel has requested, and that such amounts be
 4  awarded against each of the defendants named in this action and in our favor.
 5
 6
 7                                          Respectfully submitted,
 8
 9  Dated: June 30, 2008         _____
10                                          JOSEPH M. GAGLIARDI, President
11                                          J & J Sports Productions, Inc.
12
13
14  Sworn to before me on this _____ day
15  Of _____, 2008
16
17
18  _____
19      NOTARY PUBLIC
20
21  ///
22  ///         see attached document
23  ///
24  ///
25  ///
26  ///
27  ///
28
```

# CALIFORNIA JURAT WITH AFFIANT STATEMENT

☒ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–5 to be completed only by document signer[s], *not* Notary)

1
2
3
4
5
6

_____    _____
Signature of Document Signer No. 1    Signature of Document Signer No. 2 (if any)

State of California
County of Santa Clara

Subscribed and sworn to (or affirmed) before me on this 30th day of June, 2008, by

(1) Joseph M. Gagliardi
    Name of Signer

proved to me on the basis of satisfactory evidence to be the person who appeared before me (.) (,)

(and

(2) n-a
    Name of Signer

proved to me on the basis of satisfactory evidence to be the person who appeared before me.)

Signature _Sharon Cunningham_
            Signature of Notary Public

[Notary Seal: SHARON CUNNINGHAM, Commission # 1779347, Notary Public - California, Santa Clara County, My Comm. Expires Nov 10, 2011]

Place Notary Seal Above

--- OPTIONAL ---

Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.

**Further Description of Any Attached Document**

Title or Type of Document: Plaintiff Affidavit

Document Date: June 30, 2008    Number of Pages: 13

Signer(s) Other Than Named Above: none

The Derby February 25 2006

RIGHT THUMBPRINT OF SIGNER #1 — Top of thumb here
RIGHT THUMBPRINT OF SIGNER #2 — Top of thumb here

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org    Item #5910    Reorder: Call Toll-Free 1-800-876-6827

## PROOF OF SERVICE (SERVICE BY MAIL)

I declare that:

I am employed in the County of Los Angeles, California. I am over the age of eighteen years and not a party to the within cause; my business address is First Library Square, 1114 Fremont Avenue, South Pasadena, California 91030. I am readily familiar with this law firm's practice for collection and processing of correspondence/documents for mail in the ordinary course of business.

On July 1, 2008, I served:

**PLAINTIFF'S AFFIDAVIT IN SUPPORT OF PLAINTIFF'S APPLICATION FOR DEFAULT JUDGMENT BY THE COURT**

On all parties referenced by enclosing a true copy thereof in a sealed envelope with postage prepaid and following ordinary business practices, said envelope was duly mailed and addressed to:

Salvador Medinarios (Defendant)
2036 Ridgemont Drive
San Jose, CA 95148

I declare under the penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct and that this declaration was executed on July 1, 2008, at South Pasadena, California.

Dated: July 1, 2008

/s/ Terry Houston
**TERRY HOUSTON**